# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

WENDELL WEAVER,  )
)
*Plaintiff,*  )
)
)  No.  16 C 9400
v.  )
)  Judge Virginia M. Kendall
ALMA MARTIJA, *et al.,*  )
)
*Defendants.*  )
)

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff Wendell Weaver is an inmate within the Illinois Department of Corrections ("IDOC").  He brings multiple claims under the Eighth Amendment stemming from an allegedly inadequate response in treating his dislocated finger. The Defendants include the prison physicians who treated him, IDOC officials with whom he spoke or to whom he addressed grievances, and the physical therapist he saw after receiving surgery.  Each of these Defendants has moved for summary judgment.  (Dkts. 128, 135, 138).  The Doctor Defendants have also moved to strike Weaver's retained expert.  (Dkt. 128).  For the following reasons, the Court denies summary judgment for the Doctor Defendants and for then-Acting Chief Nicholas Lamb, grants summary judgment for the remaining IDOC Defendants and the physical therapist, and strikes Weaver's expert as unqualified.

## BACKGROUND

### A. Weaver's Injury and Treatment

Plaintiff Wendell Weaver is an inmate at Stateville Correctional Center. (Dkt. 144 ¶ 2). On August 5, 2015, Weaver injured his left pinky finger while playing basketball at the prison. (*Id.* at ¶ 24). Within two hours, Weaver was seen by Dr. Ghaliah Obaisi, who was at that time Stateville's Medical Director, but is now deceased. (Dkt, 67; Dkt. 144 ¶ 25; Dkt. 130-1 at 10, 31:8–32:21). Dr. Obaisi assessed the injury as a sprain, ordered an x-ray to check for a dislocation or fracture, and ordered pain medication for Weaver. (Dkt. 144 ¶ 25).

On August 7, 2015, Weaver spoke to a nurse about the status of his x-ray, and the nurse noted that Weaver was scheduled for an x-ray on August 11, 2015, and for a follow-up appointment with Dr. Obaisi on August 19, 2015. (*Id.* at ¶ 26).

On August 15, 2015, Weaver saw then-Stateville Staff Physician Dr. Alma Martija. (*Id.* at ¶ 3; Dkt. 130-2 at 16, 56:9–56:11). During that appointment, Dr. Martija prescribed Weaver pain medication for his injury. (Dkt. 144 ¶ 28). Her plan for treatment at that time was to allow Weaver to meet with Dr. Obaisi for their previously scheduled follow-up appointment. (*Id.*).

On August 19, 2015, Weaver had his follow-up appointment with Dr. Obaisi. (*Id.* at ¶ 29). Dr. Obaisi reviewed the radiologist's x-ray report, which showed a dislocation of the proximal interphalangeal ("PIP") joint of Weaver's finger. (*Id.* at ¶ 29). Dr. Obaisi injected Toradol and Lidocaine into Weaver's finger to anesthetize it and then performed a manual reduction to relocate Weaver's dislocated finger. (*Id.*

at ¶ 29–30; Dkt. 130-7 at 2). Dr. Obaisi then splinted Weaver's finger and ordered a follow-up x-ray. (Dkt. 144 ¶ 30; Dkt. 130-7 at 2). Dr. Obaisi also prescribed Weaver Motrin for his pain and gave him a permit to be cuffed at the waist. (Dkt. 144 ¶ 30; Dkt. 130-7 at 2). Weaver's follow-up x-ray was scheduled for August 20, 2015, but was cancelled. (Dkt. 130-7 at 2).

On August 24, 2015, Weaver had another follow-up appointment with Dr. Obaisi. (Dkt. 144 ¶ 33). Dr. Obaisi noted that there had been no change in Weaver's pinky finger and diagnosed the injury as a sprain. (*Id.*). It appears that Dr. Obaisi believed that he had corrected the dislocation when he had previously manually relocated the finger, but that the sprain was still healing. (*Id.*). That same day, Weaver had an additional x-ray. (*Id.* at ¶ 34).

Dr. Obaisi reviewed the radiologist's report from the August 24, 2015, x-ray, which showed that Weaver's finger was still dislocated. (*Id.* at ¶ 37). On August 26, 2015, Dr. Obaisi referred Weaver emergently to the emergency room at Presence St. Joseph Medical Center, and Weaver went to the hospital that day. (*Id.* at ¶ 37). The emergency-room physician attempted to manually reduce Weaver's dislocation but was unsuccessful, and so he referred Weaver for an orthopedic consultation. (*Id.* at ¶ 38). Weaver was admitted to St. Joseph, and on August 28, 2015, Dr. Salvatore Fanto performed surgery on Weaver's hand. (*Id.* at ¶ 39; Dkt. 130-7 at 4). Weaver had a surgical reduction of the PIP joint in his finger and had two tendons surgically repaired—they had ruptured. (Dkt. 130-7 at 4). Weaver also had a K-wire inserted into his finger. (*Id.*). Weaver was given a fiberglass cast and a prescription for

Tramadol, and he returned to Stateville that same day in stable condition. (Dkt. 144 ¶ 39; Dkt. 130-7 at 4).

On August 31, 2015, Weaver saw Dr. Martija. (Dkt. 144 ¶ 42). She ordered his wound dressing changed and gave him a prescription for Tylenol with codeine for pain. (*Id.*). Dr. Martija noted that Weaver was scheduled to see Dr. Obaisi in one week and the surgeon, Dr. Fanto, in one month. (*Id.*).

On September 15, 2015, Weaver saw Dr. Fanto for a follow-up appointment. (*Id.* at ¶ 44). Dr. Fanto noted that the surgery was successful, and the surgical wound was healing well. (*Id.* at ¶ 44). Dr. Fanto scheduled a surgery to remove the K-wire. (*Id.* at ¶ 44). On October 16, 2015, Dr. Fanto operated on Weaver, removing his K-wire and performing an extensor tenolysis and dorsal capsulotomy. (*Id.* at ¶ 45). The procedure was successful. (*Id.* at ¶ 45).

On October 22, 2015, Weaver complained to Dr. Obaisi about swelling at the surgical site, and Dr. Obaisi prescribed him antibiotics. (*Id.* at ¶ 45). On October 28, 2015, Weaver saw Dr. Martija for an unrelated health issue. (*Id.* at ¶ 48). While there, she ordered a nurse to remove Weaver's stitches and ordered another x-ray to check his finger. (*Id.* at ¶ 48). Weaver did not receive the follow-up x-ray, although the parties dispute whether this was because Weaver refused to undergo the x-ray. (*Id.* at ¶ 49).

At some point after Weaver's October 2015 surgery with Dr. Fanto, Weaver began physical therapy. (Dkt. 147-1 at ¶ 6).[1] Weaver testified that he did not believe

---

[1] Defendant Jose Becerra failed to file a statement of material facts with his motion for summary judgment, as is required by Northern District of Illinois Local Rule 56.1. This is grounds to strike his

he began treatment with Becerra until sometime in late November. (Dkt. 147-2 at 20, 57:17–14, 76:7). It appears that Weaver missed several physical therapy sessions due to prison lockdown or other appointments. (Dkt. 147-1 at ¶¶ 11–12).

On December 19, 2015, Weaver saw Dr. Obaisi. (Dkt. 144 ¶ 50). Dr. Obaisi's treatment plan was for Weaver to continue physical therapy. (*Id.*). Dr. Obaisi also prescribed Weaver Tylenol for pain relief. (*Id.*). In February 2016, the physical therapist, Jose Becerra told Weaver that, due to his lack of improvement, he was referring Weaver back to Dr. Obaisi. (Dkt. 147-1 ¶ 13; Dkt. 155 ¶ 8).

In January 2017, Weaver travelled to UIC for an unrelated medical issue. While there, he consulted with UIC orthopedics regarding residual pain in his left pinky finger. Dr. Mejia, the surgeon at UIC, noted that Weaver had post-traumatic arthritis in the joint. (Dkt. 144 ¶ 42). Weaver contends that, to date, his finger remains disfigured and has limited function and mobility.

**B. Grievances**

The day after his injury, on August 6, 2015, Weaver filed an emergency grievance asking for his finger to be treated. (Dkt. 137-11; Dkt. 140 ¶¶ 11–13). In his grievance, he stated that he was in "excruciating" pain. (Dkt. 137-11; Dkt. 140

---

motion entirely. Weaver, however, made a good-faith attempt to respond to the facts alleged by Becerra in his motion. (*See* Dkt. 147-1). The Court will therefore consider the facts, as responded to by Weaver. But the Court will not consider the statement of material facts filed by Becerra alongside his reply, a month after he filed his motion for summary judgment, as the Court is not required to do so. (Dkt. 153). *See Zoretic v. Darge*, 832 F.3d 639, 641 (7th Cir. 2016) ("We have repeatedly held that requiring strict compliance with Rule 56.1 is not an abuse of the district court's discretion."). Further, in his response to Weaver's statement of statement of additional material facts (Dkt. 155), Becerra denied certain allegations without providing any evidence to support his dispute, again in contravention of the local rule. The Court likewise disregards such unsupported denials or disputes.

¶¶ 11–13). He noted that Dr. Obaisi had ordered an x-ray for that day, but that he had been told that the x-ray technician would not be available until August 11, 2015. (Dkt. 137-11; Dkt. 140 ¶¶ 11–13).

On August 11, 2015, Weaver's emergency grievance was denied by Kevin Senor. (Dkt. 140 ¶¶ 13–15). Senor was an administrative assistant at IDOC. (*Id.*). Senor was responsible for signing off on documents in the grievance process as the designee to the Acting Chief at the time, Nicholas Lamb. (*Id.* at ¶¶ 2, 13–15). Senor denied Weaver's grievance as a non-emergency and directed Weaver to resubmit it in the ordinary manner, signing off with Lamb's name and Senor's own initials. (*Id.* at ¶¶ 13–15). Senor did not speak to Lamb about the grievance, and there is no evidence that Lamb reviewed it. (*Id.* at ¶ 16–19). Weaver, however, alleges that he spoke to Lamb and told him about the issues with his finger. (Dkt. 137-2 at 28–29, 31).

On September 1, 2015, after his first pinky surgery, Weaver filed a grievance requesting pain medication and to be taken to St. Joseph for a follow-up appointment. (Dkt. 140 ¶ 24). On January 29, 2016, that grievance was denied, with a notation that the "grievant appears to be receiving appropriate medical care at this time." (Dkt. 137-13 at 1; Dkt. 140 ¶ 25). James Laris, another assistant with IDOC, signed off on the grievance denial as the designee of then-Warden Randy Pfister. (Dkt. 140 ¶¶ 4, 26–28). As with Lamb and Senor, Laris did not speak to Pfister about the grievance and there is no evidence that Pfister reviewed it. (*Id.* at ¶¶ 29–33). Weaver unsuccessfully appealed through the administrative process. (*Id.* at ¶¶ 34–35). On September 28, 2016, the Administrative Review Board denied Weaver's appeal of his

September 1, 2015 grievance. (*Id.* at ¶¶ 34–35). Executive II Sarah Johnson signed off on the denial of this appeal; she had signature authority for the Director of IDOC and was responsible for reviewing such grievances. (*Id.* at ¶¶ 36–37). Johnson did not speak to the Director of IDOC about the grievance and there is no evidence that he reviewed it. (*Id.* at ¶¶ 38–42).

## LEGAL STANDARD

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see, e.g.*, *Reed v. Columbia St. Mary's Hosp.*, 915 F.3d 473, 485 (7th Cir. 2019). The parties genuinely dispute a material fact when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Daugherty v. Page*, 906 F.3d 606, 609–10 (7th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "Rule 56 'mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Zander v. Orlich*, 907 F.3d 956, 959 (7th Cir. 2018) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

## DISCUSSION

Weaver brought suit based on the treatment he was given for his injury. He brings claims for failing to provide proper medical treatment in violation of the Eighth Amendment, pursuant to 42 U.S.C. § 1983. Count I he brings against Dr. Obaisi's

estate, Dr. Martija, and Becerra.  Count II he brings against former Warden Pfister and former IDOC Director Baldwin.  And Count III he brings against former Acting Chief Lamb.  (Dkt. 105).

### A. Weaver's Affidavit

As a preliminary matter, with his response to the Doctor-Defendants' and IDOC-Defendants' motions for summary judgment, Weaver submitted affidavits signed by him.  (Dkt. 145-1; Dkt. 149).  Both sets of Defendants have moved to strike these affidavits, arguing that they were improperly submitted after the close of discovery.

Defendants move to strike pursuant to Federal Rule of Civil Procedure 37(c)(1).[2]  "Rule 37(c)(1) states that if a party fails to comply with Rule 26(a), the evidence is excluded 'unless the failure was substantially justified or is harmless.'" *Uncommon, LLC v. Spigen, Inc.*, 926 F.3d 409, 417 (7th Cir. 2019) (quoting Fed. R. Civ. P. 37(c)(1)).  In assessing such a motion, this Court considers "(1) the prejudice or surprise to the party against whom the evidence is offered; (2) the ability of the party to cure the prejudice; (3) the likelihood of disruption to the trial; and (4) the bad faith or willfulness involved in not disclosing the evidence at an earlier date."  *Id.* (quoting *Tribble v. Evangelides*, 670 F.3d 753, 760 (7th Cir. 2012)).

Defendants have supplied no information about how the affidavits have prejudiced them or why they are unable to cure any such prejudice, aside from stating

---

[2] The Court finds unavailing Weaver's argument that he should be exempt from the application of Rule 37 because he commenced this litigation as a pro se litigant.  *See* Fed. R. Civ. P. 26(a)(1)(B)(iv).  The Court recruited counsel shortly after Weaver filed his initial complaint, and Weaver has been represented by counsel in this case essentially from its inception.  (*See* Dkt. 5).

generally that they did not have "a meaningful opportunity to address and respond" to the additional affidavits. (Dkt. 157 at 5). This argument is unpersuasive. For one, Weaver was deposed twice, where defense counsel had ample opportunity to question him. In fact, most of what is in the affidavits is cumulative to what Weaver stated in his depositions. For another, Defendants have pointed to no additional discovery they were prevented from doing as a result of the late disclosure of the new affidavits. The affidavits were submitted with Weaver's response briefing, when Defendants still had an opportunity to reply, including with affidavits of their own or by seeking to reopen discovery. *See Uncommon*, 926 F.3d at 418 (failure to seek alternative remedies supported admission of late evidence). Nor have Defendants pointed to any resulting delay. For these reasons the Court declines to strike the affidavits.

That being said, "[i]t is well established that a party cannot create a genuine issue of fact by submitting an affidavit containing conclusory allegations which contradict plain admissions in prior deposition or otherwise sworn testimony." *Diliberti v. United States*, 817 F.2d 1259, 1263 (7th Cir. 1987) To the extent the affidavits contain such conclusory allegations which contradict anything Weaver stated in discovery, the Court will disregard them. *But see McCann v. Iroquois Mem'l Hosp.*, 622 F.3d 745, 751 (7th Cir. 2010) ("In contrast, when the change is plausible and the party offers a suitable explanation such as confusion, mistake, or lapse in memory, a change in testimony affects only its credibility, not its admissibility." (internal quotation marks omitted)).

## B. Nurse Reagan

Drs. Obaisi and Martija have moved to strike Plaintiff's expert's testimony. They argue that the expert, Nurse Joann Regan, is not qualified to offer an expert opinion in this case.

"The admissibility of expert testimony is governed by Federal Rule of Evidence 702 and the Supreme Court's opinion in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993)." *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009). Trial judges act as gatekeepers to screen expert evidence for relevance and reliability. *Daubert*, 509 U.S. at 589; *see also C.W. ex rel. Wood v. Textron, Inc.*, 807 F.3d 827, 834 (7th Cir. 2015). Under Rule 702, a "witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion" if the following conditions are satisfied:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. In other words, "the key to the gate is not the ultimate correctness of the expert's conclusions. . . , it is the soundness and care with which the expert arrived at her opinion." *Schultz v. Akzo Nobel Paints, LLC*, 721 F.3d 426, 431 (7th Cir. 2013). In evaluating the expert's proposed testimony, the Court should "scrutinize proposed expert witness testimony to determine if it has the same level of

intellectual rigor that characterizes the practice of an expert in the relevant field so as to be deemed reliable enough to present to a jury." *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 805 (7th Cir. 2012) (internal quotation marks omitted).

The Court utilizes a three-part analysis when applying the *Daubert* framework to proposed Rule 702 evidence. The Court determines (1) "whether the witness is qualified"; (2) "whether the expert's methodology is scientifically reliable"; and (3) "whether the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue." *Myers v. Illinois Cent. R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010) (internal quotation marks omitted); *see also Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 779 (7th Cir. 2017). The expert's proponent bears the burden of demonstrating that the testimony would satisfy the *Daubert* standard by a preponderance of the evidence. *See Gopalratnam*, 877 F.3d at 782; *see also* Fed. R. Evid. 702 advisory committee's note to 2000 amendment.

Here, the parties provided briefing regarding Nurse Regan as well as her deposition testimony, her report, and her CV. The Court is confident that these materials provide a "sufficient basis" from which the Court can assess whether to strike Nurse Regan's testimony without holding a hearing. *See Kirstein v. Parks Corp.*, 159 F.3d 1065, 1067 (7th Cir. 1998) ("We are convinced, however, that the district court had a sufficient basis for her decision without holding a hearing. We have not required that the *Daubert* inquiry take any specific form and have, in fact, upheld a judge's *sua sponte* consideration of the admissibility of expert testimony.").

The doctors point out several facts that they say show Nurse Regan is not qualified. She is a registered nurse, not a nurse practitioner or physician's assistant. (Dkt. 144 ¶¶ 7–10). Her experience is in cardiology and urology. (*Id.*). She cannot prescribe medicine, cannot diagnose when to initiate surgery, and cannot order surgery. (*Id.*). She has never performed hand surgery, nor has she manually reduced a dislocated finger or attempted to do so. (*Id.*). Weaver responds that Nurse Regan does have some experience working in an intensive care unit and general surgery, although that experience was nearly forty years ago, from 1980–1983.

The Court agrees with the doctors. Nurse Regan's testimony fails at the first step of the inquiry—she is not qualified to opine on the subject matter here. Weaver seeks to have Nurse Regan testify to the care provided by doctors, although she is a nurse. More than that, the vast majority of her experience is in a field inapplicable to the injury here, and it is undisputed that she has no experience with hand surgery or dislocated fingers. When assessing an expert's qualifications, the Court asks "not whether an expert is qualified in general but whether [s]he is qualified to answer a specific question." *United States v. Truitt*, 938 F.3d 885, 889 (7th Cir. 2019). The Court concludes that, based on the record before it, Nurse Regan is not qualified to opine on how the doctors should have treated Weaver's finger or the impact of any delay in treating his finger, as she does not have experience with such injuries. *See, e.g., id.* at 890 (psychologist without experience with certain groups was not permitted to testify regarding such groups); *Mathison v. Moats*, 812 F.3d 594, 597 (7th Cir. 2016) (doctor who was not a cardiologist was not qualified to opine on

damage to plaintiff's heart); *Hamilton v. Pike Cty., Ky.*, No. CIV. 11-99-ART, 2012 WL 6570508, at *4 (E.D. Ky. Dec. 17, 2012) (striking a nurse as an expert because, among other reasons, it was "not established that she has experience, remote or recent, diagnosing these specific illnesses").

### C. Drs. Obaisi and Martija

Having resolved the evidentiary matters, the Court turns to the substance of the motions for summary judgment. For an Eighth Amendment claim in the prisoner medical context, the Court performs "a two-step analysis, first examining whether a plaintiff suffered from an objectively serious medical condition, and then determining whether the individual defendant was deliberately indifferent to that condition." *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016) (en banc). The doctors concede that Weaver's dislocated finger was a serious medical condition. They argue, however, that they did not act with deliberate indifference.

"As its name implies, deliberate indifference requires more than negligence and approaches intentional wrongdoing." *Goodloe v. Sood*, 947 F.3d 1026, 1030 (7th Cir. 2020) (internal quotation marks omitted). "[T]he evidence must show that the prison official acted with a sufficiently culpable state of mind, meaning the official knew or was aware of—but then disregarded—a substantial risk of harm to an inmate's health." *Id.* at 1030–31 (internal quotation marks omitted).

Two lines of precedent in this Circuit are relevant here. First, "when a doctor is aware of the need to undertake a specific task and fails to do so, the case for deliberate indifference is particularly strong." *Id.* at 1031. "If there is no direct

evidence of knowing disregard, there must be at least enough evidence for a jury to draw an inference to that effect. Whether circumstantial or direct, the evidence must show that the physician was both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Wilson v. Wexford Health Sources, Inc.*, 932 F.3d 513, 520 (7th Cir. 2019) (internal quotation marks omitted). Second, "inexplicable delay in responding to an inmate's serious medical condition can reflect deliberate indifference," especially "if that delay exacerbates an inmate's medical condition or unnecessarily prolongs suffering." *Goodloe*, 947 F.3d at 1031 (internal quotation marks omitted). "Of course, delays are common in the prison setting with limited resources, and whether the length of a delay is tolerable depends on the seriousness of the condition and the ease of providing treatment." *Petties*, 836 F.3d at 730. "To show that a delay in providing treatment is actionable under the Eighth Amendment, a plaintiff must also provide independent evidence that the delay exacerbated the injury or unnecessarily prolonged pain." *Id.* at 730–31.

Beginning with Dr. Obaisi, disputes of fact make summary judgment inappropriate. When Weaver was taken to St. Joseph, the ER physician who examined him noted that he had an "obvious dislocation of the left 5th digit PIP joint."[3] (Dkt. 145-8 at 2; Dkt. 156 ¶ 17). Making reasonable inferences in favor of Weaver, as the Court must, it is possible that if the dislocation was obvious to the ER physician, it was also obvious to Dr. Obaisi as early as August 5. That Dr. Obaisi

---

[3] Over the doctors' objection, the Court considers these records as they could be admissible at trial, for example, under the business records hearsay exception. Fed. R. Evid. 803(6).

sent Weaver for an x-ray upon first examining him also supports the inference that he knew that Weaver's finger was dislocated, as even the doctors' own expert testified that "if Dr. Obaisi would have thought that it was only a sprain without a dislocation or further injury, he would not have ordered an x-ray." (Dkt. 130-6 at 22, 77:3–77:17; Dkt. 156 ¶ 3). Further, the expert's opinion that Dr. Obaisi's initial course of treatment was appropriate was based on the assumption that the dislocation was not obvious. (Dkt. 130-7 at 5). As just described, however, whether the dislocation was obvious is in dispute.

There is also a delay here. Dr. Obaisi ordered x-rays promptly, and there is no evidence that any delay in receiving those x-rays is attributable to him. But there is an unexplained delay between when Weaver was first x-rayed, on August 11, and when he was again seen by Dr. Obaisi to review that x-ray, on August 19. Additionally, Weaver's finger was not splinted until August 19. The doctors' expert, however, testified that although a delay in giving an x-ray up to two weeks may be appropriate, he added the caveat that such a delay would be appropriate *if* "the finger was splinted or the finger was immobilized or the finger was taken care of during that time." (Dkt. 130-6 at 24, 88:6–88:25). He further testified that it could be appropriate for the finger not to be splinted or immobilized if the patient was not experiencing discomfort or pain. (Dkt. 130-6 at 25, 89:1–9). Yet the evidence shows that Weaver was in pain, and it could be inferred that Dr. Obaisi knew that because he prescribed pain medication. (Dkt. 130-1 at 10, 32:4–32:17; Dkt. 144 ¶ 25; Dkt. 145-1 ¶ 4). There is also evidence suggesting that the delay in treating Weaver

exacerbated his injury; Dr. Fanto noted that the three-week delay in treating Weaver might require additional treatment, such as putting a pin in his joint, which Dr. Fanto ultimately ended up having to do. (Dkt 145-10 at 2; Dkt. 156 ¶ 20).

Viewing the evidence in the light most favorable to Weaver, a factfinder could infer that Dr. Obaisi knew Weaver's finger was dislocated, knew it needed to be treated, knew that Weaver was in pain, yet delayed treatment without good reason, and the delay both prolonged Weaver's pain and exacerbated his injury. *See Conley v. Birch*, 796 F.3d 742, 748 (7th Cir. 2015) (summary judgment was not appropriate where doctor failed to promptly treat a fracture, gave only painkillers, and did not immobilize the hand); *see also Cumbee v. Ghosh*, No. 11-CV-3511, 2016 WL 5404597, at *4 (N.D. Ill. Sept. 28, 2016) ("Delays in treatment, even if only a few days for painful conditions, can constitute deliberate indifference if the provider was subjectively aware of the problem."). In other words, a factfinder could conclude that Dr. Obaisi chose an "easier and less efficacious treatment," *i.e.*, waiting to confirm a dislocation without treating one in the meantime, "without exercising professional judgment." *Petties*, 836 F.3d at 730 (internal quotation marks omitted). The Court therefore denies summary judgment as to Dr. Obaisi.

The same is largely true for Dr. Martija. The parties make much of whether, on August 15 when Weaver interacted with Dr. Martija, he told her that he knew his finger was dislocated or that the x-ray technician had told him as much. The Court does not need to resolve that. If Weaver's finger was obviously dislocated, as was noted by the ER physician, then again, making inferences in Weaver's favor, a

factfinder could find that Dr. Martija knew Weaver's finger was dislocated when she saw it.

Unlike Dr. Obaisi, Dr. Martija is not a surgeon, has no experience with reductions, and would not attempt one on an inmate. Instead, she would refer such inmates to Dr. Obaisi. (Dkt. 130-2 at 9, 26:10–28:7). The doctors' expert, however, testified that if, on August 15, Dr. Martija knew that Weaver's finger was dislocated, the appropriate treatment would have been either to splint the finger until Weaver could see Dr. Obaisi, or to send Weaver to the emergency room. (Dkt. 130-6 at 35, 129:22–132:4). Dr. Martija did neither and merely prescribed Weaver medication for his pain. (Dkt. 144 ¶ 28). Again, that she prescribed him pain medication supports the inference that she knew he was in pain; there were also, by that point, records that Weaver had complained to Dr. Obaisi and at least one nurse that he was in pain. (*See* Dkt. 156 ¶¶ 4, 6, 8). Therefore, like with Dr. Obaisi, a reasonable factfinder could determine that Dr. Martija knew Weaver's finger was dislocated, knew it needed to be treated, knew that Weaver was in pain, yet failed to provide any form of appropriate treatment without a valid reason, thereby prolonging Weaver's pain and exacerbating his injury. For this reason, summary judgment is denied as to Dr. Martija.

**D. Becerra**

Weaver alleges that his physical therapist, Becerra, was deliberately indifferent towards his serious medical need by delaying the start of Weaver's physical therapy and by declining to further treat his finger after it did not improve

with physical therapy. In response, Becerra points out that Weaver has presented no evidence that Becerra's treatment decisions were improper nor that they caused any worsening of Weaver's injury.

Becerra's failure to comply with Local Rule 56.1 complicates this Court's assessment of the facts surrounding the physical therapy. But, even if this Court were to accept Weaver's version of events—that therapy did not begin until late November and that Becerra, not Weaver, was the one to terminate it—Becerra would still be entitled to summary judgment. (Dkt. 147-1 ¶¶ 6–9, 13–14, 28, 31–34; Dkt. 155 ¶¶ 4–5, 8–9).

As to the delay, to succeed on such a claim, Weaver must "present verifying medical evidence that the delay, and not the underlying condition, caused some harm." *Walker v. Wexford Health Sources, Inc.*, 940 F.3d 954, 964 (7th Cir. 2019) (internal quotation marks omitted). Weaver testified that he believed the delay was significant because Dr. Fanto told him that it would be important to get "aggressive physical therapy" to get mobility back in his finger. (Dkt. 147-2 at 19, 56:17–56:23). This testimony cannot create a dispute of fact—for one, Weaver is not a medical professional and his belief regarding the impact of lack of physical therapy is not "verifying medical evidence." Further, the alleged statements of Dr. Fanto are inadmissible hearsay and cannot be offered for their truth as verifying medical evidence. (Dkt. 155 ¶ 1). Weaver had the opportunity to get such evidence directly from Dr. Fanto or another expert but has not pointed to any such evidence. And while there was evidence that, after physical therapy, Weaver's hand was still stiff (*see* Dkt.

155 ¶ 11), he points to no evidence attributing that to anything done or not done in physical therapy. Without such evidence, he cannot succeed on his claim against Becerra.

As to the termination, there is no allegation here that the risks related to physical therapy would be known to a layperson. And "in those cases where unnecessary risk may be imperceptible to a lay person," to show liability the plaintiff must show "that a medical professional's treatment decision must be such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment." *Petties*, 836 F.3d at 729 (internal quotation marks omitted). Even accepting that Becerra was the one to terminate therapy due to Weaver's lack of improvement (Dkt. 155 ¶¶ 8–9), there is no evidence suggesting that such a decision was a substantial departure from accepted professional judgment, practices, or standards. Summary judgment in Becerra's favor is therefore appropriate, as Weaver has failed to present sufficient evidence to support his claim.

### E. IDOC Defendants

Weaver also brings deliberate indifference claims against the IDOC Defendants, former Acting Chief Lamb, former Warden Pfister, and the Director of IDOC, who was, at the time, Baldwin but who is now Rob Jeffreys.

There is evidence that Lamb directly interacted with Weaver, and so the analysis regarding him differs from the other IDOC Defendants. Weaver testified that he spoke to Lamb about having filed a grievance, and told Lamb about his finger

and that it was in pain. (Dkt. 137-2 at 27:21–29:5). Again, there is evidence in the record supporting the proposition that it was "obvious" that Weaver's finger was dislocated. The timing of this interaction is unclear; Weaver initially said he could not recall when it occurred but later specified in his affidavit that it occurred between August 6 and 11, 2015. (Dkt. 137-2 at 27:21–29:5; Dkt. 149 ¶ 4). Regardless, it must have occurred at some point between when Weaver first filed a grievance and November 2015, the end of Lamb's period as Acting Chief. (Dkt. 137-2 at 27:21–29:5; Dkt. 140 ¶ 2; Dkt. 149 ¶ 4). Making inferences in favor of Weaver, it could have happened as early as August 6, when Weaver filed his first grievance. And if Weaver told Lamb about having filed at least the first grievance, the Court can infer that he told Lamb what was in the grievance, namely that he was in excruciating pain and would not be able to be x-rayed for days. (Dkt. 137-11). Yet the evidence appears to show that Lamb took no action.

On this record, summary judgment in favor of Lamb is not appropriate. "[D]eliberate indifference may be found where an official knows about unconstitutional conduct and facilitates, approves, condones, or turns a blind eye to it." *Perez v. Fenoglio*, 792 F.3d 768, 781 (7th Cir. 2015) (internal quotation marks omitted). Here, there is evidence to support the proposition that Lamb knew that Weaver's finger was dislocated, knew he was not receiving prompt treatment for it, and knew he was in pain. Although Dr. Obaisi reported to Lamb (Dkt. 137-3 at 7, 23:21–24:1), Lamb declined to exercise his authority to rectify the allegedly unconstitutional treatment, which "may evidence deliberate indifference." *Perez*, 792

F.3d at 782; *see also Arnett v. Webster*, 658 F.3d 742, 755 (7th Cir. 2011) ("Non-medical defendants cannot simply ignore an inmate's plight.").  Because the evidence could allow for a finding against Lamb, the question of his liability must be left to the factfinder.  *See e.g., Martinez v. Garcia*, No. 08 C 2601, 2012 WL 266352, at *6 (N.D. Ill. Jan. 30, 2012) (summary judgment was inappropriate where plaintiff had directly told the Warden about his ailment and the medical staff's refusal to treat him).

As to Pfister and Baldwin, there is evidence to suggest that they were not aware of Weaver's injury and did not take any action regarding it.[4]  Although their designees were aware (they were the ones involved in the grievance process), typically, prison officials "cannot be held liable on the basis of respondeat superior; to be liable, [they] must be personally liable for [the] injury." *Arnett*, 658 F.3d at 755 (7th Cir. 2011); *see also Perez*, 792 F.3d at 781 (noting that "to recover damages against a prison official acting in a supervisory role, a § 1983 plaintiff may not rely on a theory of respondeat superior and must instead allege that the defendant, through his or her own conduct, has violated the Constitution").

Some courts in this district have concluded that prison officials cannot avoid liability by delegating review of grievances to others.  *See, e.g., Thomas v. Wexford Health Servs., Inc.*, 414 F. Supp. 3d 1154, 1163 (N.D. Ill. 2019) ("Pfister cannot wholly insulate himself from personal involvement in Thomas's alleged constitutional deprivation by delegating 'much of the review of medical grievances to administrative

---

[4] Weaver sued Baldwin in his official capacity, although he sued the other IDOC Defendants in their individual capacities. (Dkt. 105 ¶¶ 8-10). The parties' arguments, however, appear to assume a claim against Baldwin in his individual capacity. The Court therefore addresses such a claim for the purposes of efficiency and because it does not alter the outcome.

assistants' and claiming he was not put on notice by the emergency grievances sent to his office."); *Flournoy v. Ghosh*, 881 F. Supp. 2d 980, 992 (N.D. Ill. 2012) ("The court does not believe that McCann can use the fact that he delegated much of the review of medical grievances to administrative assistants to insulate himself from liability for problems of which the grievances would have put him on notice.").

The Court declines to wade into this issue, because even if Pfister and Baldwin personally read the grievance, they would still be entitled to summary judgment. The grievance that implicates Pfister and Baldwin is the September 1, 2015 grievance, in which Weaver requested that he be taken back to St. Joseph for a follow-up appointment and that he be given pain medication (along with other demands unrelated to the injury in this case). (Dkt. 137-12). The counselor who initially reviewed this grievance noted that, by the time she reviewed the grievance on September 17, 2015, Weaver had already been taken back to St. Joseph for a follow-up two days prior and had his second surgery scheduled at St. Joseph to remove the pin in his finger. (Dkt. 137-12).

The evidence in this case regarding allegedly unconstitutional medical treatment surrounds the delay in initially treating Weaver's finger and failing to address the dislocation for several weeks. By the time the counselor reviewed this grievance, and certainly by the time Pfister's and Baldwin's designees reviewed the grievance in January and September 2016, respectively, Weaver had received the treatment he requested, namely being taken back to St. Joseph for the follow-up procedures he was demanding. (Dkt 137-12; Dkt. 137-13). "Non-medical

defendants. . . can rely on the expertise of medical personnel" and "if a prisoner is under the care of medical experts, a non-medical prison official will generally be justified in believing that the prisoner is in capable hands." *Arnett*, 658 F.3d at 755. Unlike with Lamb, by the time Pfister and Baldwin were made aware of this grievance, Weaver was already being treated by both the prison and St. Joseph physicians, as noted in the response to the grievances. (*See* Dkt. 137-13 (noting that Weaver was receiving medical care and detailing the follow-up appointments Weaver had with the prison and St. Joseph physicians)). It is not clear what, if any, additional corrective action Pfister or Baldwin could have taken as the relief Weaver requested in this grievance had already been granted. Summary judgment is therefore appropriate on Weaver's claims against Pfister and Baldwin. *See also Greeno v. Daley*, 414 F.3d 645, 655 (7th Cir. 2005) (summary judgment appropriate where prison official reviewed complaint and verified that inmate was receiving medical treatment).

All that remains against Jeffreys in his official capacity is a claim for injunctive relief. (*See* Dkt. 49). Yet Weaver has failed entirely to argue what, if any, injunctive relief he continues to seek against Jeffreys and why it should survive summary judgment. *See United States v. Holm*, 326 F.3d 872, 877 (7th Cir. 2003) (noting that courts are not obligated "to research and construct the legal arguments open to parties, especially when they are represented by counsel" (internal quotation marks omitted)); *see also Crespo v. Colvin*, 824 F.3d 667, 674 (7th Cir. 2016) (noting that "perfunctory and undeveloped arguments, and arguments that are unsupported by

pertinent authority, are waived").  Jeffreys is therefore entitled to summary judgment on any injunctive claim against him in his official capacity.

## **CONCLUSION**

For the foregoing reasons, the Doctor-Defendants' motions are granted in part and denied in part.  (Dkt. 128) A genuine dispute of material fact remains as to the Doctor-Defendants' liability, and their motion for summary judgment is denied.  The Doctor-Defendants' motion to strike the expert testimony of Nurse Regan is granted as the Court concludes that she is not qualified to opine on the injury in this case.  Becerra's motion for summary judgment is granted as Weaver has not presented sufficient evidence to move forward with his claim against Becerra.  (Dkt. 138).  Finally, the IDOC-Defendants' motion for summary judgment is granted in part and denied in part.  (Dkt. 135).  Weaver may proceed on his claim against Lamb, but not on his claims against Pfister or Baldwin/Jeffreys.

Virginia M. Kendall
United States District Judge

Date: March 19, 2020